**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:23-cv-02990

MARIO ORTEGA, and
KAMILLE FAYE VINLUAN-JULARBAL,
each individually and on behalf of all others
similarly situated,

       Plaintiff,

          v.

SIMILASAN CORPORATION,

       Defendant.

---

## CLASS ACTION COMPLAINT

---

### I.    Introduction

1.      Defendant markets, distributes, and sells eye drops.  Defendant's eye drops are intended for use in the eye, and purport to relieve symptoms for a variety of eye ailments, such as pink eye, dry eye, and allergies.

2.      Defendant's eye drops include: Similasan Dry Eye Relief, Similasan Complete Eye Relief, Similasan Allergy Eye Relief, Similasan Kids Allergy Eye Relief, Similasan Red Eye Relief, Similasan Pink Eye Relief, Similasan Kids Pink Eye Relief, Similasan Aging Eye Relief, Similasan Computer Eye Relief, Similasan Stye Eye Relief, Similasan Pink Eye Nighttime Gel, and Similasan Dry Eye Nighttime Gel (the "Eye Drops" or "Products").

3.      But Defendant's Eye Drops are dangerously defective, for several reasons.  First, they are unapproved drugs, and thus illegal to sell. Second, they are labeled "sterile," when in

fact they are not manufactured using processes sufficiently designed to prevent contamination.

Third, they contain silver sulfate, a substance that can decrease night vision and cause

irreversible eye and skin discoloration. The Products, however, fail to warn of any of these risks.

4.      Defendant's Products are particularly troublesome from a public health

perspective, because eye products, "in general pose a greater risk of harm to users because the

route of administration for these products bypasses some of the body's natural defenses."[1]

Contaminated eye drops can result in blindness and even death.[2]

5.      Plaintiffs Mario Ortega and Kamille Faye Vinluan-Jularbal purchased and used

Defendant's Eye Drops. They did not know that the Eye Drops were unapproved drugs. They

did not know that the Eye Drops were unsafe and adulterated, that they were made using faulty

processes, or that they contained a preservative that could harm their eyes or skin. Had they

known the truth, they would not have purchased the eye drops. And if other consumers knew the

truth, they would immediately stop using the Eye Drops. Plaintiffs bring this case to force

Defendant to recall its Products and issue full refunds to consumers who used them.

## II.    Parties

6.      Plaintiff Mario Ortega is a citizen of California, domiciled in San Bernadino

County. Mr. Ortega purchased Similasan Stye Eye Relief Eye Drops.

7.      Plaintiff Kamille Faye Vinluan-Jularbal is a citizen of California, domiciled in

Sacramento County. Ms. Vinluan-Jularbal purchased Similasan Pink Eye Relief Eye Drops.

8.      The proposed class and subclasses (identified below) include citizens of all states.

---

[1] FDA Notice letter, available at https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/similasan-ag-658878-09112023.
[2] https://www.scientificamerican.com/article/eye-drops-recalled-after-deaths-and-blindness-heres-what-to-know/

9.      Defendant Similasan Corporation is a Colorado corporation with its principal place of business in Highlands Ranch, Colorado.

10.     Defendant markets, sells, and distributes the Eye Drop products.

### III.    Jurisdiction and Venue

11.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and the matter is a class action in which one or more members of the proposed class are citizens of a state different from Defendant.

12.     The Court has personal jurisdiction over Defendant because its principal place of business is within this District.

13.     Venue is proper under 28 U.S.C. § 1391(b)(1) and 28 U.S.C. § 1391(d) because Defendant resides in this district.

### IV.    Facts

#### A.    Defendant's Products

14.     Defendant markets, distributes, and sells its Eye Drop products nationwide.

15.     The Eye Drops include Similasan Dry Eye Relief, Similasan Complete Eye Relief, Similasan Allergy Eye Relief, Similasan Kids Allergy Eye Relief, Similasan Red Eye Relief, Similasan Pink Eye Relief, Similasan Kids Pink Eye Relief, Similasan Aging Eye Relief, Similasan Computer Eye Relief, Similasan Stye Eye Relief, Similasan Pink Eye Nighttime Gel, and Similasan Dry Eye Nighttime Gel" (the "Eye Drops" or "Products").

16.     For purposes of the claims asserted in this action, each of Defendant's Eye Drops are substantially similar to the other, in that: (1) each Eye Drop is a product intended for use in

the eyes that is distributed, marketed, and sold by Defendant; (2) each Eye Drop is an unapproved drug that makes drug claims; (3) each Eye Drop is labeled "STERILE," when in fact the Product is not sufficiently designed to prevent contamination; (4) each Eye Drop contains silver sulfate, but fails to warn of the risks of silver sulfate.

17.     Each Eye Drop is intended for use in the eyes, and contains instructions for use in the eyes.  For example:













18.     In addition, each Eye Drop product makes substantially similar claims regarding its use in diagnosis, cure, mitigation, or treatment of eye disease and symptoms.  For example:

| Product | Claims |
|---|---|
| Similasan Dry Eye Relief | <ul><li>Use As Often As Needed For • Dryness • Redness • Soothes • Moisturizes</li><li>temporarily relieve minor symptoms such as: • dry eye • redness of eyes and lids • reflex watering secondary to dry eye</li></ul> |

| Product | Claims |
|---------|--------|
| Similasan Complete Eye Relief | • Use As Often As Needed For • Redness • Burning • Watering • Grittiness • Dryness • Irritation<br>• temporarily relieve minor symptoms such as: • redness of eyes and eye lids • dry eye • reflex watering secondary to dry eye • sensation of grittiness • sensation of burning |
| Similasan Allergy Eye Relief | • Use As Often As Needed For • Itching • Burning • Watering • Redness<br>• temporarily relieve minor eye allergy symptoms such as: • itching • burning • excessive watering • redness of eyes and lids |
| Similasan Kids Allergy Eye Relief | • Use As Often As Needed For • Itching • Burning • Watering • Redness<br>• temporarily relieve minor eye allergy symptoms such as: • itching • burning • excessive watering • redness of eyes and lids |
| Similasan Red Eye Relief | • Use As Often As Needed For • Redness • Stinging • Irritation • Watering<br>• temporarily relieve minor eye symptoms such as: • itching • burning • redness of eyes and lids • stinging • excessive watering • irritation |
| Similasan Pink Eye Relief | • Use as often as needed for • Redness • Burning • Watery Discharge • Sensation of Grittiness<br>• temporarily relieve minor eye symptoms such as: • excessive watery (clear) discharge • sensation of grittiness • redness and burning |
| Similasan Kids Pink Eye Relief | • Use As Often As Needed For •Redness •Burning •Dryness •Stinging •Grittiness •Watering<br>• temporarily relieve minor symptoms such as: •redness of the eyes •irritation, dryness, and burning •sensation of grittiness, stinging •excessive watering (clear) |
| Similasan Aging Eye Relief | • Multi-Symptom Relief •Blurred Vision • Eyestrain • Tearing due to Dryness<br>• temporarily relieve minor symptoms such as: • Blurred vision • Eye Strain • Tearing due to dryness |

| Product | Claims |
|---------|--------|
| Similasan Computer Eye Relief | • Use As Often As Needed For • Aching Eyes • Eye Strain • Burning • Redness<br>• temporarily relieve minor symptoms such as: • aching eyes • burning • redness • strained eyes (Computer, TV, reading, driving) |
| Similasan Stye Eye Relief | • Multi-Symptom Relief • Redness • Burning • Tearing<br>• temporarily relieve minor symptoms such as: • redness • burning • eyelid redness • tearing |
| Similasan Pink Eye Nighttime Gel Relief | • Use As Often As Needed For • Redness • Burning • Watery Discharge •Sensation of Grittiness<br>• temporarily relieve minor eye symptoms: • excessive watery (clear) discharge • sensation of grittiness • redness and burning |
| Similasan Dry Eye Nighttime Gel | • Use As Often As Needed For • Dryness • Redness<br>• temporarily relieve minor eye symptoms such as: • dry eye • redness of eyes and lids •reflex watering secondary to dry eye |

      **B.**     **Defendant's Products are unapproved new drugs.**

    19.     Both Federal and state regulations apply to the sale of drugs.

    20.     The federal Food, Drug, and Cosmetics Act ("FDCA") (21 U.S.C. §§ 301 et. seq.) defines drugs as "articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals." 21 § U.S.C. 321(g)(1)(B).   Products that qualify as drugs must comply with the regulations for drugs.  Under federal law, a new drug generally cannot be introduced or delivered into interstate commerce without an approved FDA application in effect.[3]  21 U.S.C. §§355(a), 331(d).  Sale of unapproved new drugs is illegal.

---

[3] Subject to some exceptions, which do not apply here.

21.    The California Sherman Food, Drug, and Cosmetics Law mirrors the federal regulations. Under the California Sherman Act, a drug includes "[a]n article used or intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in human beings or any other animal." Cal. Health & Safety Code § 109925(a).  And, under California's Sherman Act, new drugs generally cannot be sold unless a new drug application has been approved. Cal Health & Safety Code §111550.

22.    As explained in greater detail above, each of Defendant's Eye Drops claims to cure, mitigate, or treat eye diseases in humans. For example, the packaging on the Eye Drops makes claims that the products can soothe pink eye, provide allergy relief, provide dry eye relief, or relieve other eye symptoms.  Thus, each of the Eye Drop products are drugs under both the FD&C Act, and the California Sherman Act. 21 § U.S.C. 321(g)(1)(B); Cal. Health & Safety Code § 109925(a).

23.    In addition, none of the Eye Drops have been approved as new drugs.  Thus, they are unapproved new drugs that are illegal both under federal and state law.

24.    Further, the FDA agrees that Defendant's Eye Drops are unapproved drugs.  On September 11, 2023, the FDA sent Similasan AG (Defendant's related company) a letter stating that the Eye Drops were "unapproved new drugs under section 505(a)" of the FD&C Act.  Thus, the FDA explained, "introducing or delivering these products for introduction into interstate commerce violates sections 301(d) and 505(a) of the FD&C Act, 21U.S.C. 331(d) and 355(a)," and is thus illegal.[4]

25.

---

[4] https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/similasan-ag-658878-09112023

**C.    Defendant's use of the word "STERILE" in its packaging is misleading.**

26.    Each of Defendant's Eye Drops contain the words "STERILE EYE DROPS" on

the packaging.

27.    As one example:



28.    Each of the other Eye Drops have the same representation on the front of their

packages.

29.    The representation that the Products are sterile, however, is false and misleading,

because Defendant fails to ensure that the Products are actually sterile.

30.    In its September 2023 letter, the FDA stated that Defendant's Products were

manufactured without establishing and following "procedures that are designed to prevent

microbiological contamination of drug products purporting to be sterile, and that include

validation of all aseptic and sterilization processes."[5]  This increases the risk of contamination,

and fails to ensure sterility. Because Defendant fails to use processes designed to prevent

_____

[5] https://www.fda.gov/inspections-compliance-enforcement-and-criminal-
investigations/warning-letters/similasan-ag-658878-09112023

9

microbiological contamination, Defendant's claim that its Eye Drops are "sterile" is false and

misleading.

        **D.**      **Defendant's use of silver sulfate makes the Products defective, and
Defendant fails to disclose these risks.**

        31.      Defendant's Eye Drops are also defective for an additional reason. Each Eye Drop

product uses silver sulfate as a preservative. For example:



        32.      Silver sulfate, however, is not safe for use as an eye drop preservative, because

deposits of silver in the conjunctiva and cornea may cause decreased night vision, and silver can

cause irreversible eye and skin discoloration. Thus, the use of silver sulfate as a preservative

violates 21 C.F.R. 200.50(b)(1), which requires that preservatives for eye products be "safe and

harmless."[6] Defendant fails to warn of these risks.  Defendant's packaging fails to warn that

silver sulfate can cause decreased night vision, eye discoloration, or skin discoloration.

_____

[6] https://www.fda.gov/inspections-compliance-enforcement-and-criminal-
investigations/warning-letters/similasan-ag-658878-09112023 at n. 1.

Defendant further failed to warn that the use of silver sulfate as a preservative is neither suitable nor harmless.

33.     Moreover, the use of silver sulfate is unnecessary.  Other eye drop makers can, and do, make eye drops that do not contain silver sulfate. As one example, Visine makes eye drops that do not list silver sulfate as an ingredient.  Similarly, Alcon's Opti-Free line of eye drops does not list silver sulfate as an ingredient.  This shows that it is possible to make eye drops that do not use silver sulfate.

**E.     Defendant knew of the defects.**

34.     Companies that manufacture ophthalmologic products, such as Defendant, are aware of the FDA regulations regarding drugs. Defendant is also aware that its labels contain claims intended for the use in diagnosis, cure, mitigation, or treatment of disease.

35.     Defendant was also on notice that its practices violated the FDCA regulations, because the FDA inspected the manufacturing facilities for the Eye Drop products and warned its related company, Similasan AG, about the conditions.

36.     From March 27, 2023, to April 4, 2023, the FDA inspected the drug facility that manufactures the Eye Drops at issue here.  After the inspection, the FDA warned Similasan AG about the conditions.  Thus, at least as of April 2023, after the FDA inspection, Defendant was aware that its manufacturing processes did not meet FDA standards.  Defendant's website also acknowledges that it received an FDA warning letter after a facility inspection.[7]

37.     Similarly, Defendant is aware that each of its Products make a "STERILE" representation.  Defendant is further aware that its products are not manufactured using

---

[7] Similasan Statement regarding FDA Warning Letter: https://www.similasanusa.com/similasan-statement-regarding-fda-warning-letter

procedures that are designed to prevent microbiological contamination of drug products

purporting to be sterile.

38.     Finally, Defendant is aware that it uses silver sulfate as a preservative, and aware

of the risks.  As a manufacturer of eye products, Defendant is aware of research regarding the

risks of various ingredients in the eye.  Defendant is aware that silver sulfate can affect vision

and discolor the eye and surrounding area.

**F.     Plaintiffs suffered injury.**

39.     In fall 2022, Plaintiff Ortega purchased Similasan Stye Eye Relief Eye Drops at a

Walmart store in Ontario, CA.

40.     Plaintiff Ortega purchased the product for personal use.

41.     In purchasing the item, Plaintiff Ortega relied on Defendant's position as a maker

of eye products, and believed that the products would be safe for use in the eye. The packaging

did not disclose that the Product was an unapproved drug that was illegal. If Plaintiff had known

that the Product was an unapproved drug, he would not have purchased the Product.

42.     In addition, Plaintiff Ortega saw and relied on the representations on the front of

the packaging that the Product was "sterile."  If Defendant had disclosed that its Products were

not in fact sterile, or made in manufacturing conditions that risked contamination, Plaintiff would

not have purchased the Product.

43.     Finally, Plaintiff Ortega was unaware that the Product contained a preservative

that could decrease night vision, and risked eye and skin discoloration.  If he knew of this risk,

he would not have purchased the Product.

12

44.     Thus, Plaintiff Ortega suffered economic injury as a result of Defendant's actions. Plaintiff would purchase additional Eye Drops if they were redesigned to be FDA approved, sterile, and did not contain any harmful preservatives.  Plaintiff, however, faces an imminent threat of harm because he will not be able to rely on the representations of the package and the comprehensiveness of warnings in the future, and thus will not be able to purchase the Product.

45.     On August 31, 2023, Plaintiff Vinluan-Jularbal purchased Similasan Pink Eye Relief Eye Drops at a Walmart store in Elk Grove, CA.

46.     Plaintiff Vinluan-Jularbal purchased the product for personal use.

47.     In purchasing the item, Plaintiff Vinluan-Jularbal relied on Defendant's position as a maker of eye products, and believed that the Product would be safe for use in the eye. The packaging did not disclose that the Product was an unapproved drug that was illegal. If Plaintiff had known that the Product was an unapproved drug, she would not have purchased the Product.

48.     In addition, Plaintiff Vinluan-Jularbal saw and relied on the representations on the front of the packaging that the Product was "sterile."  If Defendant had disclosed that its Products were not in fact sterile, or made in manufacturing conditions that risked contamination, Plaintiff would not have purchased the Product.

49.     Finally, Plaintiff Vinluan-Jularbal was unaware that the Product contained a preservative that could decrease night vision, and risked eye and skin discoloration.  If she knew of this risk, she would not have purchased the Product.

50.     Thus, Plaintiff Vinluan-Jularbal suffered economic injury as a result of Defendant's actions.  Plaintiff would purchase additional Eye Drops if they were redesigned to be FDA approved, sterile, and did not contain any harmful preservatives.  Plaintiff, however,

faces an imminent threat of harm because she will not be able to rely on the representations of the package and the comprehensiveness of warnings in the future, and thus will not be able to purchase the product.

**G.    Defendant's actions injured Plaintiffs and class members.**

51.    Defendant's sale of unapproved drugs, false and misleading representations of sterility, and failure to warn of the dangers of silver sulfate allowed it to charge more for the Eye Drops than it otherwise would have been able to.

52.    Because the Eye Drops are unapproved drugs, the sale of the Products is illegal. If consumers knew the truth, the Products would not be on the market, and consumers would not have purchased the Products.

53.    In addition, if consumers had known that the Eye Drops were not sterile, consumers would not have purchased the products.

54.    If consumers had been warned of the risks of silver sulfate, consumers would not have purchased the Products, or, at a minimum, would have paid substantially less for them.

55.    Thus, as a result of Defendant's sale of unapproved drugs, misrepresentations, and omissions, Plaintiffs and class members were charged a price premium and sustained economic injuries.

56.    The who, what, when, where, and how are as follows.

57.    <u>Who</u>: Defendant Similasan Corporation USA.

58.    <u>What</u>: Defendant made misrepresentations on the packaging of the Eye Drops by stating that the Products were "STERILE," "Eye Drops," for "Eye Relief."  These representations led consumers to believe that the Eye Drops were sterile, and safe to use in the

eyes for eye relief. In addition, Defendant made misrepresentations by: (a) selling its Products at retail, which was a representation that the products were of merchantable quality and were safe for their ordinary use; (b) marketing the Products to consumers for use as eye drops; and (c) making partial representations that are misleading because they warned of some risks of the Product, but failed to warn of others— specifically, that the Products were unapproved drugs, that they were made with unsafe manufacturing processes, and that they contained a preservative that can decrease vision and discolor eyes and skin. Defendant also made fraudulent omissions by failing to disclose that its products were unapproved drugs, that they were made with unsafe manufacturing processes, and that they contained a preservative that risks decreasing vision and discoloring eyes and skin.

59.     When:  In fall 2022, Plaintiff Ortega purchased Similasan Stye Eye Relief Eye Drops at a Walmart store in Ontario, CA. On August 31, 2023, Plaintiff Vinluan-Jularbal purchased Similasan Pink Eye Relief Eye Drops at a Walmart store in Elk Grove, CA.

60.     Where: Plaintiff Ortega purchased Similasan Stye Eye Relief Eye Drops at a Walmart store in Ontario, CA. Plaintiff Vinluan-Jularbal purchased Similasan Pink Eye Relief Eye Drops at a Walmart store in Elk Grove, CA. Defendant should and could have included the omitted warnings on its marketing materials including on its website; on the product packaging, such as the box of the Products; and/or on the Products themselves. But, as described above, no such warnings were included on any of these materials. The misrepresentations were made on the product packaging and on the website.

61.     How: Defendant's representations and omissions led Plaintiffs and other reasonable consumers to believe that Defendant's Products were safe for use as eye drops. They

led consumers to believe that the Products were sterile.  In fact, as described in greater detail above, Defendant's Products are not safe for use as eye drops, and not made in a way to ensure sterility. Defendant knew this, but did not warn of it.

62.     Plaintiffs seek damages and, in the alternative, restitution.  Plaintiffs are permitted to seek equitable remedies in the alternative because they have no adequate remedy at law.

**V.     No Adequate Remedy at Law.**

63.     A legal remedy is not adequate if it is not as certain as an equitable remedy. To obtain a full refund as damages, Plaintiffs must show that the Product they received has essentially no market value. In contrast, Plaintiffs can seek restitution without making this showing. This is because Plaintiffs purchased a Product that they would not otherwise have purchased, but for Defendant's misrepresentations and omissions.  Obtaining a full refund at law is less certain that obtaining a refund in equity.

64.     In addition, the elements of Plaintiffs' equitable claims are different and do not require the same showings as Plaintiffs' legal claims.  For example, to obtain damages under the CLRA, a plaintiff must show that they complied with the CLRA's notice requirement for damages.  No such requirements exist to obtain restitution.  Obtaining damages under the CLRA requires Plaintiffs to show that Defendant made negligent or fraudulent misrepresentations.  No such requirement exists for Plaintiffs to obtain equitable relief, for example under the "unfair" or "unlawful" prong of the UCL.  Because a plaintiff must make this additional showing to obtain damages, rather than restitution, the legal remedies are more uncertain.

65.     Finally, the remedies at law available to Plaintiffs are not equally prompt or otherwise efficient.  The need to schedule a jury trial may result in delay.  And a jury trial will

16

take longer, and be more expensive, than a bench trial.  Plaintiffs seek damages and, in the alternative, restitution.  Plaintiffs are permitted to seek equitable remedies in the alternative because they have no adequate remedy at law.

## VI.    Class Action Allegations.

66.    Plaintiffs bring claims on behalf of themselves as well as (a) a nationwide class of consumers who purchased the Eye Drops during the applicable statute of limitations (the "Nationwide Class"); (b) for certain claims, a subclass of consumers who purchased the Products in California (the "California Subclass"), and (c) for certain claims, a subclass of consumers who, while living in California, Connecticut, Illinois, Maryland, Missouri, and New York, purchased the Eye Drops during the applicable statute of limitations (the "Consumer Protection Subclass").

67.    The following people are excluded from the class and the subclasses: (1) any Judge or Magistrate Judge presiding over this action and the members of their family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendant's counsel, and their experts and consultants; and (6) the legal representatives, successors, and assigns of any such excluded persons.

### *Numerosity*

68.    The proposed class(es) contain members so numerous that separate joinder of each member of the class is impractical. Based on the pervasive distribution of Defendant's

17

Products, there are tens of thousands of proposed class members (or more).

*Commonality*

69.    There are questions of law and fact common to the proposed class.  Common

questions of law and fact include, without limitation:

(1)    Whether the Eye Drops are unapproved drugs,

(2)    Whether the Eye Drops are fit for their ordinary and intended use;

(3)    Whether Defendant engaged in an unlawful deceptive practice in marketing and

selling the Products as is;

(4)    Whether Defendant was unjustly enriched by the sale of the Products;

(5)    Whether Plaintiffs suffered ascertainable loss as a result of Defendant's conduct;

(6)    Whether Defendant should be enjoined from further sales of the seats;

(7)    What damages are needed to compensate Plaintiffs and the proposed class(es).

*Typicality*

70.    Plaintiffs' claims are typical of the proposed class.  Like the proposed class,

Plaintiffs purchased the Products.

*Adequacy*

71.    The interests of the members of the proposed class and subclass will be

adequately protected by Plaintiffs and their counsel. Plaintiffs' interests are aligned with, and do

not conflict with, the interests of the members of the proposed class or subclasses that they seek

to represent. Moreover, Plaintiffs have retained experienced and competent counsel to prosecute

the class and subclasses' claims.

*Predominance and Superiority*

72.    The prosecution of separate actions by individual members of the proposed class would create a risk of inconsistent or varying adjudication with respect to individual members, which would establish incompatible standards for the parties opposing the class. For example, individual adjudication would create a risk that the same product is found unfit for its ordinary use for some proposed class members, but not for others. Common questions of law and fact predominate over any questions affecting only individual members of the proposed class. These common legal and factual questions arise from certain central issues which do not vary from class member to class member, and which may be determined without reference to the individual circumstances of any particular class member. For example, a core liability question is common: whether Defendant has made and marketed an unapproved drug.

73.    A class action is superior to all other available methods for the fair and efficient adjudication of this litigation because individual litigation of each claim is impractical. It would be unduly burdensome to have individual litigation of millions of individual claims in separate lawsuits, every one of which would present the issues presented in this lawsuit.

## VII.    Claims.

### Count I: Violation of California's Unfair Competition Law (UCL)
### (on behalf of Plaintiffs and the California Subclass)

74.    Plaintiffs incorporate by reference and re-allege each and every factual allegation set forth above as though fully set forth herein.

75.    Plaintiffs bring this cause of action on behalf of themselves and members of the California Subclass.

76.     Defendant has violated California's Unfair Competition Law (UCL) by engaging in unlawful, fraudulent, and unfair conduct (i.e., violating each of the three prongs of the UCL).

**The Unlawful Prong**

77.     As alleged in detail above, Defendant has violated the unlawful prong by virtue of its violations of the Sherman Food Drug & Cosmetics Laws, California's Health & Safety Code §§ 109875 et seq., and selling unapproved drugs.

78.     In addition, Defendant engaged in unlawful conduct by violating the CLRA and FAL, as alleged above and below and incorporated here.

**The Fraudulent Prong**

79.     As alleged in detail above, Defendant has violated the fraudulent prong of section 17200 because (1) its sale of unapproved drugs; (2) its misrepresentations that the Eye Drops were sterile and suitable for use as eye drops for eye relief; and (3) its material omissions about the unapproved drugs, sterility of its products, and dangers of silver sulfate were likely to deceive a reasonable consumer, and did deceive Plaintiffs and reasonable consumers.  The true facts were material to Plaintiffs, and would be material to a reasonable consumer.

**The Unfair Prong**

80.     Defendant has violated the unfair prong of section 17200 because the acts and practices set forth in the Complaint—including the sale of unapproved drugs, the sale of eye drops that have not been manufactured using sterile conditions, and the use of silver sulfate as an eye drop preservative—offends established public policy. The challenged conduct is substantially injurious to consumers. The harm that these acts and practices cause to consumers greatly outweighs any benefits associated with them. Reasonable consumers are not in a position

to know and understand the safety concerns posed by unapproved drugs. Reasonable consumers do not know what the manufacturing practices of an eye drop maker are, and whether the practices are sufficient to ensure sterility. In addition, reasonable consumers do not research eye drop preservatives, and do not know the dangers of silver sulfate as an eye drop preservative.

81.     Defendant's conduct also impairs competition within the market for eye care products, and stops Plaintiffs and Class members from making fully informed decisions about the kind of eye drops to purchase, or the price to pay for such products.

82.      Defendant's conduct caused substantial injury to Plaintiffs and subclass members. The harm to Plaintiffs and the subclass greatly outweighs the public utility of Defendant's conduct (which is none). Distributing or selling unsafe, unapproved drugs has no public utility at all. There is no public utility in distributing or selling eye drops that are unsafe and not sterile. This injury was not outweighed by any countervailing benefits to consumers or competition. Distributing and selling products unsafe and unfit for their intended purposes only injures healthy competition and harms consumers.

83.     Plaintiffs and the subclass could not have reasonably avoided this injury. As alleged above, Defendant's false representations and omissions were deceiving to reasonable consumers.

84.     Defendant's conduct, as alleged above, was immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

85.     For all prongs, Plaintiffs saw and reasonably relied on Defendant's false representations and omissions when purchasing the Eye Drops.

86.     Defendant failed to tell consumers that the Eye Drops were unapproved drugs.

87.    Defendant also falsely represented that the Eye Drops were sterile.

88.    Defendant further failed to warn consumers that the preservative used in the Eye Drops could be harmful to the eyes.

89.    Defendant knew of these defects, but actively concealed them.

90.    The warnings could have been included on the packaging for the product. But Defendant did not include any such warning. Instead, as further alleged above, the packaging instead represents that the Eye Drops are safe for use in the eyes, and that they are sterile.

91.    Defendant had a duty to warn of the defects. The defects were central to the Eye Drops' function, and because consumers could not reasonably know the product was defective, Defendant had exclusive knowledge of the defect. Still, Defendant actively concealed the defect from consumers by failing to disclose it on the product's packaging.

92.    Defendant's false representations and omissions were material. Plaintiffs and other reasonable consumers would not have purchased the product had they known the product was an unapproved drug, that it was not sterile, and that it could harm eyes. Thus, subclass-wide reliance can be inferred. Defendant's false representations and omissions were a substantial factor in Plaintiffs' purchase decisions and the purchase decisions of class members.

93.    Plaintiffs and subclass members were injured as a direct and proximate result of Defendant's conduct because: (a) they would not have purchased the Eye Drops if they had known they were unsafe and unfit for use in the eye; (b) they overpaid for the Products because the Products are sold at a price premium due to Defendant's false representations and omissions; or (c) they received a Product that is worthless for its intended purpose.

## Count II: Violation of California's Legal Remedies Act (CLRA)
### (on behalf of Plaintiffs and the California Subclass)

94.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

95.     Plaintiffs bring this cause of action on behalf of themselves and members of the California Subclass.

96.     Plaintiffs and the other members of the California Subclass are "consumers," as the term is defined by California Civil Code § 1761(d).

97.     Plaintiffs, the other members of the California Subclass, and Defendant have engaged in "transactions," as that term is defined by California Civil Code § 1761(e).

98.     The conduct alleged in this Complaint constitutes unfair methods of competition and unfair and deceptive acts and practices for the purpose of the CLRA, and the conduct was undertaken by Defendant in transactions intended to result in, and which did result in, the sale of goods to consumers.

99.     As alleged more fully above, Defendant has violated the CLRA by falsely representing to Plaintiffs and other members of the California Subclass that the Eye Drops are safe and fit for ordinary use, when in fact, the Eye Drops are dangerous for use in the eyes and can cause injury. As described in greater detail above, the Eye Drops (1) are unapproved drugs, (2) are made with unsafe and faulty manufacturing processes, and (3) contain silver sulfate.

100.     In addition, the packages prominently state that the Eye Drops are "STERILE," when in fact they are made using unsafe manufacturing processes that do not ensure sterility.

101.     As a result of engaging in such conduct, Defendant has violated California Civil Code §§ 1770(a)(2), (a)(5), (a)(7), and (a)(9).

102.    Defendant's conduct was likely to deceive, and did deceive, Plaintiffs and reasonable consumers.  Defendant knew, or should have known through the exercise of reasonable care, that Products were unsafe and that presenting them as fit for use as eye drops for eye relief was deceptive.

103.    Defendant's false representations were intended to induce reliance, and Plaintiffs saw and reasonably relied on them when purchasing the Eye Drops.  Defendant's false representations of safety and fitness for use as eye drops were a substantial factor in Plaintiffs' purchase decision.

104.    In addition, class-wide reliance can be inferred because Defendant's false representations were material, i.e., a reasonable consumer would consider them important in deciding whether to buy the Eye Drops.

105.    Defendant's false representations were a substantial factor and proximate cause in causing damages and losses to Plaintiffs and Subclass members.

106.    Plaintiffs and Subclass members were injured as a direct and proximate result of Defendant's conduct because (a) they would not have purchased the Products if they had known they were unsafe and unfit for use in the eye; (b) they overpaid for the Products because they are sold at a price premium due to Defendant's false representations; or (c) they received a Product that is worthless for its intended purpose.

107.    Accordingly, pursuant to California Civil Code § 1780(a)(2), Plaintiffs, on behalf of themselves and all other members of the California Subclass, seek injunctive relief.

108.    CLRA § 1782 NOTICE. On September 20, 2023, a CLRA demand letter was sent to Defendant's Colorado headquarters and Colorado registered agent, via certified mail (return

receipt requested).  Defendant does not have a California headquarters or California registered

agent.  This letter provided notice of Defendant's violation of the CLRA and demanded that

Defendant correct the unlawful, unfair, false and/or deceptive practices alleged here. Defendant

did not respond within the 30-day notice period. Accordingly, Plaintiffs seek all monetary and

equitable relief allowed under the CLRA, including actual damages, punitive damages, and

reasonable attorneys' fees.

109.    The CLRA venue declarations are attached.

### Count III: Violation of California's False Advertising Law (FAL)
### (on behalf of Plaintiffs and the California Sublass)

110.    Plaintiffs incorporate by reference and re-allege each and every allegation set

forth above as though fully set forth herein.

111.    Plaintiffs bring this cause of action on behalf of themselves and members of the

California Subclass.

112.    As alleged more fully above, Defendant has falsely advertised the Eye Drops by

falsely representing that the Products are safe and fit for use as Eye Drops.  As detailed above,

Defendant's Products prominently state "Eye Drops" and "Eye Relief" on the front of each

package.  The packages also prominently state that the Eye Drops are "STERILE."  This led

consumers to believe that the Eye Drops were sterile and safe and fit for use as eye drops.

113.    Defendant's false representations were likely to deceive, and did deceive,

Plaintiffs and reasonable consumers.  Defendant knew, or should have known through the

exercise of reasonable care, that their representations were inaccurate and misleading.

25

114.     Defendant's false representations were intended to induce reliance, and Plaintiffs saw and reasonably relied on them when purchasing the Eye Drops.  Defendant's false representations were a substantial factor in Plaintiffs' purchase decisions.

115.     In addition, class-wide reliance can be inferred because Defendant's false representations were material, i.e., a reasonable consumer would consider them important in deciding whether to buy Eye Drops.

116.     Defendant's false representations were a substantial factor and proximate cause in causing damages and losses to Plaintiffs and Subclass members.

117.     Plaintiffs and Subclass members were injured as a direct and proximate result of Defendant's conduct because (a) they would not have purchased the Products if they had known the Products were unsafe and unfit for use in the eye; (b) they overpaid for the Products because the Products were sold at a price premium due to Defendant's false representations; or (c) they received a Product that is worthless for its intended purpose.

### Count IV: Violations of State Consumer Protection Statutes
### (on behalf of Plaintiffs and the Consumer Protection Subclass)

118.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

119.     This count is brought on behalf of Plaintiffs and the Consumer Protection Subclass for violations of the following state consumer protection statutes:

| State | Statute |
|-------|---------|
| California | Cal. Bus. & Prof. Code § 17200, and the following; *Id.* §17500, and the following; Cal. Civ. Code §1750 the following. |
| Connecticut | Conn. Gen Stat. Ann. § 42- 110, and the following. |
| Illinois | 815 ILCS § 501/1, and the following. |
| Maryland | Md. Code Ann. Com. Law, § 13-301, and the following. |
| Missouri | Mo. Rev. Stat. § 407, and the following. |
| New York | N.Y. Gen. Bus. Law § 349, and the following. |

120.    Each of these consumer protection statutes prohibits unfair, unconscionable, and/or deceptive acts or practices in the course of trade or commerce or in connection with the sales of goods or services to consumers.

121.    As alleged in detail above, Defendant's conduct, including the marketing and sale of its Products to consumers, violates each statute's prohibitions.

122.    As further alleged above, Defendant's misrepresentations and omissions were a substantial factor in Plaintiffs' purchase decisions and the purchase decisions of subclass members. Defendant's misrepresentations and omissions were misleading to a reasonable consumer, and Plaintiffs and subclass members reasonably relied on Defendant's misrepresentations.

123.    Plaintiffs and subclass members were injured as a direct and proximate result of Defendant's conduct because (a) they would not and could not have purchased the Defendant's Products if they had known the truth, (b) they overpaid for the Products because the Products were sold at a price premium due to the illegality, misrepresentation, and omissions, and/or (c) they received a Product that was defective and thus less valuable than what they paid for.

124.    In this way, Plaintiffs and the members of the proposed Subclass have suffered an

ascertainable loss, in an amount to be determined at trial.

**Count V: Breach of Implied Warranties**
**(on behalf of Plaintiffs and the Nationwide Class)**

125.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as

though fully set forth herein.

126.    Plaintiffs bring this count individually and for the Nationwide Class.  In the

alternative, Plaintiffs bring this cause of action on behalf of themselves and members of the

California Subclass.

*Implied Warranty of Merchantability*

127.    The Uniform Commercial Code § 2-314 states that "a warranty that [] goods shall

be merchantable is implied in a contract for their sale if the seller is a merchant with respect to

goods of that kind." "Merchantable" goods must be "fit for the ordinary purposes for which the

goods are used."

128.    Defendant is and was, at all relevant times, a merchant with respect to eye drop

products. The Eye Drops constitutes a "good" under the UCC.

129.    Plaintiffs and Class Members purchased the Eye Drops.

130.    As the manufacturer of the Eye Drops, Defendant impliedly warranted to

Plaintiffs and the Class that the Eye Drops were of merchantable quality and were safe for their

ordinary use.

131.    In fact, when sold and at all times thereafter, the Eye Drops were not in

merchantable condition and were not fit for the ordinary purpose. Specifically, as described in

greater detail above, the Products are not safe for use as eye drops because (1) they are

unapproved drugs, (2) they are made with faulty and unsafe manufacturing processes, and (3) they contain silver sulfate. The defective design makes them unfit for their ordinary purposes even when used correctly.

132.     Thus, Defendant breached the implied warranty of merchantability in connection with the sale and distribution of the Eye Drops.

133.     Plaintiff Ortega provided Defendant with notice of this breach, by mailing a notice letter to Defendant's headquarters, on September 20, 2022.

134.     Plaintiff Vinluan-Jularbal provided Defendant with notice of this breach, by mailing a notice letter to Defendant's headquarters, on September 20, 2022.

135.     Plaintiffs and the Class were foreseeable third-party beneficiaries of Defendant's sale of the Eye Drops.  Defendant sells Eye Drops to retailers for distribution and sale to consumers such as Plaintiffs and Class Members.

136.     Defendant's breach directly caused Plaintiffs and class members harm.  Plaintiffs and Subclass members were injured as a direct and proximate result of Defendant's conduct because (a) they would not have purchased the Defendant's Products if they had known the truth, (b) they overpaid for the Products because the Products are sold at a price premium due to the misrepresentation and omissions, and/or (c) they received a product that was defective and thus worthless for its intended purpose.

### *Implied Warranty of Fitness*

137.     The Uniform Commercial Code § 2-315 states that where a seller "has reason to know any particular purpose for which the goods are required and that the buyer is relying on the

seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified

under the next section an implied warranty that the goods shall be fit for such purpose."

138.    Plaintiffs and Class Members purchased the Eye Drops for the purpose of using

them as eye drops for eye relief.

139.    Defendant knew, or had reason to know, that Plaintiffs and Class Members were

purchasing the Products for this particular purpose.  Defendant directs consumers to use the

Products as eye drops, for eye relief.  And, as detailed above, Defendant's Products prominently

state "Eye Drops" and "Eye Relief" on the front of each package. Defendant is aware that

consumers purchase the Products for use as eye drops.

140.    Defendant markets itself as a knowledgeable and effective developer and

purveyor eye drop products.

141.    Defendant knew, or had reason to know, that Plaintiffs and Class Members would

justifiably rely on Defendant's particular skill and knowledge of eye drops in selecting or

purchasing products suitable for use as eye drops.

142.    Plaintiffs and Class Members did justifiably rely on Defendant's judgment and

skill.

143.    The Eye Drops were not suitable for their intended purpose. The Products are not

safe for use as eye drops because, as described in greater detail above, (1) they are unapproved

drugs, (2) they are made with faulty and unsafe manufacturing processes, and (3) they contain

silver sulfate.

144.    Thus, Defendant breached its implied warranty of fitness concerning the Eye

Drops.

145.    Plaintiff Ortega provided Defendant with notice of this breach, by mailing a notice letter to Defendant's headquarters, on September 20, 2022.

146.    Plaintiff Vinluan-Jularbal provided Defendant with notice of this breach, by mailing a notice letter to Defendant's headquarters, on September 20, 2022.

147.    Plaintiffs and the Class were foreseeable third-party beneficiaries of Defendant's sale of the Eye Drops.  Defendant sells Eye Drops to retailers for distribution and sale to consumers such as Plaintiffs and Class Members.

148.    Defendant's breach directly caused Plaintiffs and class members harm.  Plaintiffs and Subclass members were injured as a direct and proximate result of Defendant's conduct because (a) they would not have purchased the Defendant's Products if they had known the truth, (b) they overpaid for the Products because the Products are sold at a price premium due to the misrepresentation and omissions, and/or (c) they received a product that was defective and thus worthless for its intended purpose.

### Count VI: Breach of Express Warranty
### (on behalf of Plaintiffs and the Nationwide Class)

149.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.  In the alternative, Plaintiffs bring this cause of action on behalf of themselves and members of the California Subclass.

150.    Plaintiffs bring this count individually and for the Nationwide Class.

151.    As detailed above, Defendant makes, markets, and sells the Eye Drops.

152.    As detailed above, Defendant markets the product as Eye Drops for "Eye Relief." Each Product has a statement on the front of the packaging stating that they are "Eye Drops" for "Eye Relief."  These statements are an affirmation of fact about the Eye Drops (i.e. a

representation that the Products are safe for use in the eye as eye drops) and a promise relating to the goods.

153.    In fact, the Products do not conform to this express representation. The Products are not safe for use as eye drops because (1) they are unapproved drugs, (2) they are not made with faulty manufacturing processes, and (3) they contain silver sulfate.

154.    Defendant further warrants that the products are sterile.  As detailed above, Defendant expressly states on the product packaging that the Products are "STERILE."  This is an affirmation of fact that the Eye Drops are sterile, and made in a way to ensure sterility.  As described in further detail above, the manufacturing processes used to make the Eye Drops, however, are flawed, and do not ensure sterility.

155.    Each of these warranties were part of the basis of the bargain, and Plaintiffs and Class Members saw and relied on each of these warranties.

156.    Plaintiff Ortega provided Defendant with notice of this breach, by mailing a notice letter to Defendant's headquarters, on September 20, 2022.

157.    Plaintiff Vinluan-Jularbal provided Defendant with notice of this breach, by mailing a notice letter to Defendant's headquarters, on September 20, 2022.

158.    Defendant's breach directly caused Plaintiffs and class members harm.  Plaintiffs and Subclass members were injured as a direct and proximate result of Defendant's conduct because (a) they would not have purchased the Defendant's Products if they had known the truth, (b) they overpaid for the Products because the Products are sold at a price premium due to the misrepresentation and omissions, and/or (c) they received a product that was defective and thus less valuable than what they paid for.

**Count VII: Fraudulent Omission**
**(on behalf of Plaintiffs and the Nationwide Class)**

159.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

160.    Plaintiffs bring this count individually and for the Nationwide Class.  In the alternative, Plaintiffs bring this cause of action on behalf of themselves and the California Subclass.

161.    As alleged in detail above, Defendant made materially misleading omissions concerning the safety of its Products.

162.    In deciding to purchase Eye Drop products from Defendant, Plaintiffs and the class reasonably relied on Defendant's omissions to form the mistaken belief that the Products were safe for use as eye drops.

163.    As alleged in detail above, Defendant's fraudulent conduct was knowing and intentional.  The omissions made by Defendant were intended to induce and actually induced Plaintiffs and class members to purchase the Products.  Plaintiffs would not have purchased the products had they known of the defects.  Class-wide reliance can be inferred because Defendant's omissions were material, i.e., a reasonable consumer would consider them important to their purchase decision.

164.    As alleged in detail above, Defendant had a duty to disclose the defect.

165.    Plaintiffs and class members were injured as a direct and proximate result of Defendant's fraudulent omissions because (a) they would not have purchased the Products if they had known the truth; (b) they overpaid for the Products because the Products are sold at a

price premium due to Defendant's misleading representations and omissions, or (c) they received

a Product that was defective and thus worthless.

166.    Defendant's acts were done maliciously, oppressively, deliberately, with intent to

defraud, and in reckless disregard of Plaintiffs' rights and well-being to enrich Defendant.

Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to

deter such conduct in the future, which amount is to be determined according to proof.

**Count VIII: Unjust Enrichment**
**(on behalf of Plaintiffs and the Nationwide Class)**

167.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as

though fully set forth herein.

168.    Plaintiffs bring this count individually and for the Nationwide Class.

169.    Plaintiffs and Class Members purchased Eye Drops. They reasonably believed

that the Products would function as advertised, and would be fit for their expected ordinary

purpose. Plaintiffs and Class Members did not, and could not, have known that the Eye Drops

were defective.

170.    Plaintiffs and Class Members conferred a tangible and material economic benefit

upon Defendant by purchasing defective eye drops.

171.    In exchange for the purchase price, Defendant provided products with inherent

defects, which make the products unfit and unsafe for their ordinary use. Defendant knew and

appreciated the benefit they incurred from consumers purchasing their Eye Drops.

172.    Thus, Defendant is aware of, and has retained, the unjust benefit conferred upon

them by Plaintiffs and the Class Members.

173.    Defendant received a direct and unjust benefit, at the Plaintiffs' expense.

174.    Plaintiffs and the Nationwide Class seek restitution.

**VIII.  Jury Demand**

175.    Plaintiffs demand a jury trial on all issues so triable.

**IX.    Prayer for Relief**

176.    Plaintiffs seek the following relief individually and for the proposed class and
subclasses:

- An order certifying the asserted claims, or issues raised, as a class action;

- A judgement in favor or Plaintiffs and the proposed class;

- An order appointing Plaintiffs as representatives for the Nationwide Class, the Consumer
  Protection Subclass, and the California Subclass, and appointing their counsel as lead
  counsel for the classes;

- An order awarding Plaintiffs and all other class members damages in an amount to be
  determined at trial for the wrongful acts of Defendant;

- A declaration that the Eye Drops are unfit for ordinary purposes and pose a serious safety
  risk to consumers;

- An order enjoining Defendant from engaging in or continuing to engage in the
  manufacture, marketing, and sale of unapproved new drugs; requiring Defendant to issue
  corrective actions including notification and recall of the Eye Drops;

- Damages, statutory damages, treble damages, and punitive damages where applicable;

- Restitution as authorized by law;

- Disgorgement, and other just equitable relief;

- Pre- and post-judgment interest;

- Reasonable attorneys' fees and costs, as allowed by law; and

- Any additional relief that the Court deems reasonable and just.

Date: November 10, 2023          Respectfully submitted,

                                        */s/ Jonas Jacobson*

                                        **Jonas Jacobson**
DOVEL & LUNER, LLP
201 Santa Monica Blvd., Suite 600
Santa Monica, California 90401
Telephone: (310) 656-7066
Facsimile: (310) 656-7069
jonas@dovel.com

*Attorney for Plaintiffs*